Michael Joel **PENNINGTON**, Plaintiff,

v.

**CITY OF HUNTSVILLE, ALABAMA,**
Defendant.

No. CV98–H–2026–NE.

United States District Court,
N.D. Alabama,
Northeastern Division.

April 24, 2000.

Samuel Fisher, Joel S. Isenberg, Gordon Silberman Wiggins & Childs, Birmingham, AL, for Michael Joel Pennington, plaintiff.

Michael Joel Pennington, Madison, AL, pro se.

Michael L. Fees, C. Gregory Burgess, Allen L. Anderson, Fees & Burgess PC, Huntsville, AL, for City of Huntsville, defendant.

## MEMORANDUM OF DECISION

HANCOCK, Senior District Judge.

The Court has before it the January 10, 2000 motion of the defendant, the City of Huntsville, Alabama, for summary judgment. Pursuant to the Court's January 11, 2000 order, as amended by the Court's January 26, 2000 order, the motion was deemed submitted, without oral argument, on February 22, 2000.

## I. Procedural History

Plaintiff Michael Joel Pennington commenced this action on July 27, 1998 by filing a pro se complaint[1] alleging racial discrimination and also alleging religious retaliation. (*See* Compl. 4–5.) An amended complaint was filed on October 20, 1999. The amended complaint also alleged employment discrimination on the basis of race and retaliation based upon prior requests and grievances concerning religious accommodation, and sought to raise claims under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the equal protection and due process clauses of the Fourteenth Amendment.[2] (*See* Am. Compl. *passim.*) More specifically, the amended complaint stated that the plaintiff initially had been denied a promotion and that plaintiff later had been offered a promotion but on different terms than an employee of another race, both as a result of discrimination and retaliation. (*See* Am. Compl. ¶¶ 8–19.) In response, defendant's January 10, 2000 motion for summary judgment asserts that no genuine issues of material fact exist and that the defendant is entitled to judgment as a matter of law. (*See* Def.'s Mot. Summ. J. 1.)

The parties have each filed briefs and submitted copious evidence in support of their respective positions concerning the pending motion for summary judgment. On February 1, 2000, the defendant submitted evidence[3] in support of its motion, and on February 8, 2000, the defendant filed a supporting brief. On February 15,

---

1. The plaintiff also sought permission to proceed without paying filing fees.

2. Plaintiff has now withdrawn his claims under the due process clause of the Fourteenth Amendment. (*See* Pl.'s Br. 3 n. 1.) Therefore, any due process aspects of the instant case need not and will not be discussed further.

3. The defendant submitted the December 1, 1999 deposition of plaintiff Michael Joel Pennington; the plaintiff's application for employment with the defendant; excerpts from the plaintiff's personnel file (Documents 0000162–63); the defendant's personnel manual; an undated class specifications for the

position of neighborhood services programmer; a May 1999 class specification for the position of neighborhood services programmer; a June 1995 promotional procedure for the position of neighborhood services programmer; an April 16, 1996 memorandum from Charles E. Perry to Betty Smith; a document headed "Interview Questions Recreation Programmer June 10, 1999"; a July 2, 1996 memorandum from Mia L. Puckett to Richard Liles (Documents 002179–80); a July 11, 1996 letter from Mia L. Puckett to the plaintiff; a July 17, 1996 memorandum from Richard Liles to Terry Hatfield (Document 000797); handwritten notes of Mia L. Puck-

2000, the plaintiff submitted evidence[4] in opposition to the defendant's motion. The plaintiff supplemented his evidentiary submissions on February 17, 2000.[5] Finally, plaintiff filed an opposing brief on March 14, 2000. The issues having been thoroughly briefed, the defendant's motion for summary judgment is now ripe for decision.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment always has the initial responsibility of stating for the court the grounds for the motion and of pointing out those portions of the pleadings or other filings which it feels show the nonexistence of any genuine is-

ett; handwritten notes of Joey Flanders; an August 19, 1996 memorandum from Richard Liles to the plaintiff; an August 23, 1996 memorandum from the plaintiff to Richard Liles; a November 22, 1996 memorandum from Terry Hatfield to the plaintiff; a transcript of the plaintiff's January 9, 1997 show cause hearing with attached additional documents; a January 23, 1997 memorandum from the defendant's Personnel Committee to the plaintiff; the plaintiff's August 21, 1996 EEOC charge; the defendant's September 20, 1996 response to the notice of plaintiff's EEOC charge; the January 4, 2000 deposition of Richard Liles; the December 8, 1999 deposition of Mia Puckett; the December 7, 1999 deposition of Ralph Stone; and the December 7, 1999 deposition of Tony Hughes.

4. The plaintiff submitted the defendant's "Promotion, Demotion, Transfer" policy; a list of the defendant's employee grievance hearings since January 1, 1994; undated class specifications for the positions of recreation aide and neighborhood services programmer; May 1999 class specifications for the positions of recreation aide and neighborhood services programmer; an August 23, 1994 memorandum from Tony Hughes to Betty Smith; an August 23, 1994 memorandum from Tony Hughes to the plaintiff; an October 5, 1994 memorandum from Betty Smith to Richard Liles; an October 25, 1994 memorandum from the defendant's Personnel Committee to the plaintiff; a November 1, 1994 memorandum from Mia L. Puckett to Betty Smith; a November 2, 1994 memorandum from Charles Perry to Jim Putnum; a November 3, 1994 memorandum from Betty Smith to Mia L. Puckett; a December 16, 1994 memorandum from Richard Liles to Betty Smith; a• December 21, 1994 memorandum from the defendant's Personnel Committee to the plaintiff; a December 22, 1994 memorandum from John W. Laughinghouse to Richard Liles; a December 22, 1994 memorandum

from Tony Hughes to Richard Liles; a June 6, 1995 document headed "Promotional Procedure for Position of Neighborhood Services Programmer"; a July 5, 1995 memorandum from Charles Perry to the plaintiff; March 1996 applications for the position of neighborhood services programmer; an April 16, 1996 memorandum from Betty Smith to Charles Perry; a document labeled "Interview Questions Recreation Programmer June 10, 1996"; a June 11, 1996 memorandum from Tony Hughes to John Mayes; the plaintiff's June 19, 1996 grievance; a June 26, 1996 memorandum from Betty Smith to the plaintiff; a July 2, 1996 memorandum from Mia L. Puckett to Richard Liles; a July 11, 1996 letter from Mia L. Puckett to the plaintiff; an August 19, 1996 memorandum from Richard Liles to the plaintiff; an August 19, 1996 memorandum from Betty Smith to Richard Liles; the plaintiff's August 21, 1996 EEOC charge; an April 9, 1997 letter from defendant's City Council to the plaintiff; an August 23, 1996 memorandum from the plaintiff to Richard Liles; the transcript of the plaintiff's August 29, 1996 show cause hearing; an October 4, 1996 memorandum from Mia L. Puckett to Richard Liles; the August 20, 1997 meeting agenda for the Scruggs Community Center; notes discussing Tony Hughes (Documents 000782–84); notes discussing neighborhood services programmer applicants' objective qualifications (Documents 001041–42); the plaintiff's November 14, 1996 grievance appeal form; and Documents 000729–30, 000741–45, 000753–54, 000756–60, 000763–70, 000772, 000778, 000782–85, and 000795–97.

5. The Plaintiff filed the second page of a December 22, 1994 memorandum from Tony Hughes to Richard Liles and a July 17, 1996 memorandum from Betty Smith to Claudia Anderson.

sues of material facts. *See id.* at 323, 106 S.Ct. 2548. Once the moving party has met his burden, Rule 56(e) mandates that the non-movant must "go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting Rule 56).

The appropriate substantive law will guide the determination of which facts are material and which are simply irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. But "[i]f the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir.1991)(*en banc*)). If the moving party bears the burden of proof at trial, then it can meet its initial burden on summary judgment only by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e., facts "that would entitle it to a directed verdict if not controverted at trial." *Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce "significant, probative evidence" presenting a genuine issue of material fact for trial. *Id.* at 1115–16.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *See id.* First, the moving party may produce affirmative evidence negating a material fact, thus showing that the opposing party will be not be able to meet the necessary elements of its case at trial. *See id.* at 1116. Once the moving party satisfies its burden using this method, the non-moving party must counter with enough positive evidence to overcome a trial motion for a directed verdict. *See id.*

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. *See id.* at 1115–16. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to notify the court that sufficient evidence to support the non-moving party's case is lacking. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either identify for the court record evidence not noted by the movant but sufficient to overcome a directed verdict, or the non-moving party "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17. However, when responding to the motion, the non-movant may not rely on bare allegations of wrongdoing, but must come forward with some evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

## III. Relevant Undisputed Facts

As part of a proposed pretrial order, the parties submitted to the Court an agreed summary of the case. At the February 22, 2000 pretrial conference, both parties again reviewed and concurred in the agreed summary, which was incorporated into the Court's pretrial order. (*See* Feb. 22, 2000 Order 2–3.) Because the parties' summary is a fair and succinct recital of the undisputed facts of the case, the Court will set forth a somewhat condensed version of the relevant portions.

The plaintiff is a black male employed by the defendant City of Huntsville. Since 1988, the plaintiff has worked as a recreational aide, first on a part-time basis and later on a full-time basis. Until the winter of 1995, the plaintiff was assigned to the defendant's Scruggs Center. In 1994, however, the plaintiff filed a grievance seeking a religious accommodation and was then transferred to the Westside Center. (*See* Feb. 22, 2000 Order 2.)

The plaintiff later applied for a position as a neighborhood services programmer with the defendant in March of 1996. Five people, including the plaintiff, were certified to be interviewed for the opening. Following the interviews, Joey Flanders, a white male, was chosen to fill the position. Plaintiff then filed a grievance, on June 19, 1996, alleging that he had been denied the promotion because of retaliation and because of racial discrimination. The defendant's own Equal Employment Officer concluded that the plaintiff's prior request for a religious accommodation had been improperly considered in filling the neighborhood services programmer position. (*See* Feb. 22, 2000 Order 2.)

Following the Equal Employment Officer's findings, the job offer to Flanders was rescinded. (*See* Feb. 22, 2000 Order 2.) Richard Liles, who headed the Parks and Recreation Department, then conducted new interviews for the position. (*See* Feb. 22, 2000 Order 2–3.) After the new interviews, Flanders was again offered a job as a neighborhood services programmer at the Scruggs Center, but, this time, the plaintiff was also offered a position as a neighborhood services programmer at another center. However, the plaintiff's offer was subject to conditions not imposed upon the offer extended to Flanders. (*See* Feb. 22, 2000 Order 3.) Although not mentioned in the parties' summary, it is also undisputed that Liles eventually requested that the plaintiff indicate his acceptance of the offer, with all attached conditions, in writing and that the plaintiff responded that he would accept only when the defendant placed the conditions attached to the job offer in writing. (*See* Aug. 19, 1996 Liles Mem.; Aug. 23, 1996 Pennington Mem.) Neither the plaintiff nor the defendant ever supplied the other with the requested documents.

## IV. Applicable Substantive Law and Analysis

As noted previously, plaintiff's amended complaint asserts employment discrimination claims under Title VII, under 42 U.S.C. § 1981 as enforced through 42 U.S.C. § 1983, and under the equal protection clause of the Fourteenth Amendment as enforced through 42 U.S.C. § 1983. All of the plaintiff's claims are premised, essentially, upon two incidents from the late spring and summer of 1996: the defendant's initial decision not to promote plaintiff to the position of neighborhood services programmer[6] and the defendant's

---

**6.** The Court notes that the plaintiff's section 1981 and 1983 claims relating to the initial failure to promote appear to be time barred as the selection of plaintiff's comparator occurred no later than the middle of June of 1996 but plaintiff's initial complaint was not filed until July 27, 1998, and his amended complaint was not filed until October 20, 1998, both dates being more than two years after the incident. *See* Ala.Code § 6–2–38(*l*) (1993) (providing for a two-year statute of limitation for personal injury actions); *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660–61, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (holding that state personal injury statutes of limitation apply to section 1981 as well as section 1983 claims); *Wilson v. Garcia*, 471 U.S. 261, 276–79, 105 S.Ct. 1938, 85 L.Ed.2d

later decision to extend a conditional offer of promotion to the same position. Because plaintiff's various theories of recovery all relate to the same incidents, the Court will, for the sake of clarity, discuss only the Title VII claims, but notes that the outcome is the same for the corresponding section 1981 and section 1983 claims.[7] The Court will address plaintiff's claims in reverse chronological order, starting with the conditional promotion. First, however, a discussion of the appropriate analytical framework is necessary.

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen"). In general, a plaintiff may attempt to establish a case of employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. *See id.; Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989) (ADEA case). *See also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir.1999) (recognizing the availability of either direct or circumstantial evidence). A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir.1997); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir.1987). Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption." *Burns v. Gadsden State Community College*, 908 F.2d 1512 (11th Cir.1990). *Cf. Wright v. Southland Corp.*, 187 F.3d 1287, 1293–94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition). However, direct evidence does not include "stray remarks in the workplace" or "statements by non-decisionmakers" or "statements by decisionmakers unrelated to the decisional process itself." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). *See also EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (quoting *Price Waterhouse*).

Here, the plaintiff asserts that he has direct evidence of discrimination and of retaliation. The plaintiff offers that the decision-makers were aware of his prior requests and complaints concerning his religious accommodation; that Richard Liles testified that Betty Smith, the Recreation Services Manager, seemed annoyed when informed that the plaintiff was to be given

---

254 (1985) (holding that, for section 1983 claims, federal courts are to borrow the appropriate state law statute of limitation for personal injury claims); *Patterson v. Augat Wiring Sys., Inc.*, 944 F.Supp. 1509, 1518 (M.D.Ala.1996) (noting the applicability of Alabama's two-year personal injury statute of limitation). However, given the Court's ultimate decision in this case, this statute of limitation issue need not be addressed in any greater detail.

7. The elements and evaluation of section 1981 and section 1983 claims are identical to the elements and evaluative structure found in Title VII cases. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.

1998) ("Both of these statutes [Title VII and section 1981] have the same requirements of proof and use the same analytical framework, therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."); *Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th Cir.1995) ("In a case such as this alleging disparate treatment, in which § 1983 is employed as a remedy for the same conduct attacked under Title VII, '"the elements of the two causes of action are the same."'" (quoting *Cross v. State of Ala.*, 49 F.3d 1490, 1508 (11th Cir.1995) (quoting *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir.1982)))).

a religious accommodation; that Richard Liles testified that he would have expected Tony Hughes, the Recreation Services Zone Coordinator, to be more annoyed than Smith as Hughes was quick-tempered; that the plaintiff's scores on the initial screening measure were higher than those of Joey Flanders, who was initially offered a position as a neighborhood services programmer; that Hughes found what he considered to be negative information when reviewing the plaintiff's personnel file; that Mia Puckett, the defendant's Equal Employment Officer, believed that retaliation based on the plaintiff's prior religious accommodation (but not racial discrimination) had influenced the initial decision regarding the programmer position; that Liles was aware of and even involved in the prior dispute over religious accommodation; and that Liles placed conditions on the plaintiff's promotion and also proposed an assignment to the Calvary Hills Center rather than to the Scruggs Center. (*See* Pl.'s Br. 23–25.) A mere cursory review of the plaintiff's supposedly direct evidence reveals that it is no more than indirect or circumstantial evidence of discrimination and retaliation, as "courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [an illegal criterion], to constitute direct evidence of discrimination." *Carter,* 870 F.2d at 582 (footnote omitted). *See also Schoenfeld,* 168 F.3d at 1266 (quoting *Carter,* 870 F.2d at 582). None of the evidence cited by plaintiff so clearly denotes an impermissible animus as to be direct evidence of discrimination or retaliation.

▇▇▇ First, simple consciousness of prior complaints by the employee alone is not direct evidence of a retaliatory or discriminatory intent; indeed, basic knowledge of prior protected activities is most relevant to a circumstantial showing of retaliation. *See, e.g., Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir.1997) (stating that, at a mini-

mum, bare knowledge of protected activity by the defendant is required as part of a circumstantial case of retaliation). Nor are Liles's observations about Smith and Hughes direct evidence. First, neither Smith nor Hughes ever flatly stated that she or he was annoyed at the plaintiff because of his previous religious accommodation; Liles inferred that they were annoyed at the plaintiff based on Hughes's general demeanor and based on Smith's attitude when she was informed of the decision to accommodate plaintiff. That Liles's observations about Hughes and Smith even suggest an improper animus toward the plaintiff is the result of an inference (whether by Liles or the plaintiff or anyone else), which is the very definition of circumstantial evidence. *See Schoenfeld,* 168 F.3d at 1266 (defining circumstantial evidence as that which "at best merely suggests a discriminatory motive"); *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081–82 (11th Cir.1990) ("[T]he evidence at issue here, at most, *suggests* discrimination, leaving the trier of fact to *infer* discrimination based upon the evidence; by definition then, the evidence is circumstantial."); *Young v. General Foods Corp.,* 840 F.2d 825 (11th Cir.1988) (finding that comment that plaintiff was the same age as a superior's father was not direct evidence of discrimination because plaintiff had to infer a discriminatory meaning to an otherwise neutral comparison). Second, any expressions of annoyance were not directly related to the decision-making process in regard to the promotion, which took place two years later. *See Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring) (stating that comments by decision-makers but unrelated to the decision-making process are not direct evidence); *Alton Packaging,* 901 F.2d at 924 (quoting *Price Waterhouse* ). Furthermore, any comments made by Smith or any emotions displayed by her in reaction to the plaintiff's religious accommodation are irrelevant as she was not

really a decision-maker.[8] *See Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring) (observing that comments made by someone other than a decision-maker are not direct evidence); *Alton Packaging*, 901 F.2d at 924 (quoting *Price Waterhouse*). Similarly, Mia Puckett's conclusion (apparently based in large part upon her conversations with Tony Hughes) that retaliation based upon the plaintiff's earlier grievances regarding religious accommodation had affected the initial decision are not direct evidence as they are the inferences drawn by one not involved in the decision-making process. *See Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. 1775; *Earley*, 907 F.2d at 1081–82; *Alton Packaging*, 901 F.2d at 924 (quoting *Price Waterhouse*).

Plaintiff also argues that the alleged statements by Hughes that Puckett noted in the course of her investigation and that formed a basis for her conclusions are direct evidence of retaliation. Hughes supposedly told Puckett that the plaintiff's personnel file contained some negative information and that a review of the file revived unpleasant memories concerning the plaintiff's reaction to a prior transfer, which was made as part of an attempt to provide the plaintiff with a requested religious accommodation. (*See* Puckett Notes (Docs.000782–83); Puckett Dep. 74–77.)

Although Puckett concluded that Hughes's statements revealed an unintentional but impermissible bias, her role, in keeping with the spirit of her position as an Equal Employment Officer, was basically that of a zealous advocate for the complaining employee; when viewed by a more detached observer but still taking the facts, as a whole, in the light most favorable to the plaintiff, Hughes's alleged statement is not the type of unmistakably discriminatory utterance that constitutes direct evidence.[9] *See Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir.1989) (describing the type of remarks that constitute direct evidence); *Schoenfeld*, 168 F.3d at 1266 (quoting *Carter*, 870 F.2d at 582). Indeed, no impermissible motives are detectable. Hughes never stated to Puckett that he was displeased that the plaintiff sought or was awarded an accommodation or even intimated that he considered the fact that plaintiff had filed a grievance in connection with his pursuit of the accommodation; what Hughes considered negative was the documentation concerning the plaintiff's reaction to being transferred, which incidentally happened to be part of the accommodation that the plaintiff was granted. (*See* Puckett Notes (Doc. 000783); Puckett Dep. 75–77.) Hughes was displeased not because the plaintiff had engaged in any protected activity but because of the plain-

8. As the plaintiff has convincingly argued, Hughes was the de facto decision-maker in regard to the initial decision not to promote the plaintiff, as he selected Flanders for the positions and Smith merely "rubber-stamped" his choice. (*See* Pl.'s Br. 14; July 2, 1996 Puckett Mem.) Smith and the rest of her staff were excluded completely from the later decision, by Liles, to offer the plaintiff a conditional promotion. (*See* Aug. 19, 1996 Smith Mem.)

9. Although not necessary to the outcome of the present matter, the Court notes that Puckett's conclusions almost certainly would not be admissible at trial under Federal Rule of Evidence 403. *See* Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Her findings are but marginally probative given her detachment from the actual decision-making process, yet they are highly prejudicial because of her then-position as the defendant's own Equal Employment Officer and patently unfair because the nature of her position virtually mandated that she advance the interests of the purportedly aggrieved employee over those of her own employer, the defendant. The Court is also concerned that allowing Puckett's conclusions into evidence would have a chilling effect on employer's willingness to establish and maintain independent Equal Employment Officers to assist in the laudable goal of promoting a workplace free from illegal employment practices.

tiff's attitude in reacting to the change in his work assignment.

■ That leaves plaintiff's evidence that he had higher scores on the initial screening device than did Flanders and that Liles placed certain conditions on the plaintiff's promotion not placed on Flanders's promotion and decided to assign the plaintiff to a center other than the plaintiff's first choice. Again, none of the plaintiff's evidence rises to the requisite level of "the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [some improper factor] ...." *Carter,* 870 F.2d at 582 (footnote omitted). The law does not mandate that an employer promote the best or the most able candidate. *See, e.g., McCarthney v. Griffin–Spalding County Bd. of Educ.,* 791 F.2d 1549, 1552 (11th Cir.1986). Although the proffered evidence may suggest bad business judgment, such is not the same thing as direct evidence of discrimination. *See id. See also Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir. 1997). Employers may legally engage in "differential treatment" of employees without violating the law, so long as the reason for the difference is not illegal. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984). Furthermore, that permissible differential treatment need not be based upon purely objective factors, but may include subjective elements as well. *See, e.g., McCarthney,* 791 F.2d at 1552 (11th Cir.1999) (holding that "[t]he use of recommendations does not, because they are subjective, require us automatically to invalidate the [defendant] school system's promotion procedure"). In short, merely showing that the plaintiff was not treated the same as Flanders is not direct evidence of either discrimination or retaliation.

Having considered the type of evidence presented and having concluded that the plaintiff has offered only circumstantial evidence, the Court must now address the type of claims presented. Plaintiff's Title VII claims involve allegations of illegal discrimination and retaliation. Title VII provides generally that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's *race,* color, religion, sex, or national origin ...." 42 U.S.C. § 2000e–2(a)(1) (1994) (emphasis supplied). In addition, certain forms of retaliation are also prohibited. Specifically, Title VII prohibits covered employers from retaliating against any employee who "has opposed any practice made an unlawful employment practice by this subchapter [which includes 42 U.S.C.2000e–2(a)(1) ], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (1994). Essentially the same analytical framework is applied to Title VII claims premised on circumstantial evidence of retaliation as to Title VII claims based on circumstantial evidence of disparate treatment, although the articulation of certain elements differs. *Compare Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir.1998) (discussing elements and burdens of production and proof in a Title VII retaliation claim); *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1196–97 (11th Cir.1997) (discussing the three-prong analysis applied to retaliation cases); *and Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 600–01 (11th Cir.1986) (applying the general Title VII framework from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to a retaliation case) *with Combs,* 106 F.3d at 1527–28 (discussing the general analytic guide in discrimination cases under Title VII).

■ "In evaluating Title VII claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs*

*v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)." *Combs,* 106 F.3d at 1527. Under the *McDonnell Douglas* and *Burdine* framework, the Title VII plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See id.* at 1527–28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984); *Lincoln v. Board of Regents of Univ. Sys.,* 697 F.2d 928, 937 (11th Cir.1983). In general, a plaintiff establishes a prima facie case of racial discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

■ Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to proffer a legitimate and nondiscriminatory reason for its actions. *See Combs,* 106 F.3d at 1528. The employer's burden is so light as to be virtually weightless, meaning that the employer need merely put forth a legitimate reason for its actions and need not convince the court that the reason offered was the true, motivating force. *See Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1495 (11th Cir. 1989). If the employer satisfies that burden by articulating a nondiscriminatory reason, then the presumption of discrimination falls and the burden of production again shifts to the defendant to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination. Although the prima facie case is irrelevant once the employer

has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. *See Combs,* 106 F.3d at 1528. Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248. 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Alexander v. Fulton County,* 207 F.3d 1303, 2000 WL 331384, at *23 (11th Cir.2000); *Combs,* 106 F.3d at 1529–38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.,* 9 F.3d 913, 920–21 (11th Cir.1993).

Having determined the proper framework for analysis, the Court now turns to a consideration of the plaintiff's claims. Here, the claims are better considered in reverse order. The Court, therefore, begins with those allegations relating to the defendant's conditional offer of promotion.

**A. The Conditional Offer of Promotion**

Both parties agree that following new interviews after the defendant's initial decision not to promote the plaintiff, the defendant did offer the plaintiff a position as a neighborhood services programmer, subject to certain conditions, which were not placed upon the neighborhood services

programmer offer made to Joey Flanders, who is white. (*See* Feb. 22, 2000 Order 2–3.) The offer was contingent upon an agreement by the plaintiff to submit to additional reviews to be conducted by Richard Liles at three and six months and to participate in a writing skills class or program to be selected by the plaintiff but for which the defendant would pay. (*See* Liles Dep. 102–15; Puckett Dep. 107–08, 113.) The parties disagree over the purpose and the effect of these conditions. Basically, the plaintiff argues that the conditions imposed upon the offer as well as his proposed assignment to the Calvary Hills Center rather than to his preferred post at the Scruggs Center were motivated by racial animus and by retaliation for prior grievances (including a request for religious accommodation in scheduling) and were illegal under Title VII. However, the defendant argues that the plaintiff cannot meet his prima facie case for either his race or retaliation claim, and that even if he could, the defendant's decisions were motivated by legitimate concerns, which plaintiff has not shown to be pretexts for discrimination. The Court will consider the race claim and the retaliation claim separately.

### 1. The Race Claim

■ The plaintiff claims that race played a part in the conditions placed upon the promotion offered him and in his proposed assignment to the Calvary Hills Center instead of the Scruggs Center. Ordinarily, when one complains of discrimination in promotion, a prima facie case requires evidence of the following four elements: (1) the plaintiff was a member of a protected class; (2) the plaintiff was actually qualified for the position sought; (3) the plaintiff was rejected for the promotion; and (4) the position was filled by someone outside the plaintiff's class. *See Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1333 (11th Cir.1998) (citing *Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1073 (11th Cir.1995)). Clearly, if the Court required plaintiff to meet these elements, he could not establish a prima facie case because he was not rejected for promotion to the position of neighborhood services programmer but, in fact, was offered the position, albeit subject to certain conditions and with an assignment to a center other than the plaintiff's favored site.[10] However, as discussed above, the articulation of the elements of any prima facie case of employment discrimination is not fixed. *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984). "The specific proof required for a prima facie case will vary from case to case." *Lincoln v. Board of Regents of Univ. Sys.,* 697 F.2d 928, 937 (11th Cir.1983) (italics omitted). Stated differently, because each case of alleged discrimination is unique, the court is to work within the *McDonnell Douglas* framework in articulating elements that speak to the circumstances of the particular case. *See Nix,* 738 F.2d at 1185. Looking to the general *McDonnell Douglas* elements, plaintiff, to satisfy his prima facie case, must present evidence (1) that he was a member of a protected class; (2) that he was qualified for a promotion to neighborhood services programmer; (3) that his offer of promotion was subject to

---

**10.** Plaintiff argues that he was denied a promotion, because he claims that he applied for the neighborhood services programmer position at the Scruggs Center, to which his comparator, Joey Flanders, was assigned. (*See* Pl.'s Br. 39.) Although the programmer position at Scruggs was vacant when the plaintiff applied for a promotion, the uncontroverted evidence establishes that the position was not site specific and that applicants were not guaranteed assignment to a particular center. (*See* Hughes Dep. 15–16; Position Class Spec-

ification for Neighborhood Services Programmer (Doc. 000806); Nov. 22, 1996 Hatfield Mem. 1.) The evidence also establishes that two programmer positions were open; the initial decision had been to fill only one of the openings, but upon re-interviewing the candidates, Richard Liles decided to fill both jobs. (*See* Liles Dep. 75.) In short, the plaintiff was competing not for the Scruggs Center position but simply for *a* position as *a* neighborhood services programmer, which he was offered.

certain adverse conditions; and (4) that the conditions to which his offer was subject were not attached to an offer of promotion to an otherwise similarly situated person outside plaintiff's class. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Even with the elements more closely tailored for the plaintiff's situation, the Court is not convinced that the plaintiff has met his prima facie case. The Court accepts that the plaintiff belongs to a protected class and that he was at least minimally qualified for the position; indeed, the defendant has not sought to contest those two elements. However, the third and the fourth requirements are troubling.

Under *McDonnell Douglas,* the plaintiff must be subject to an adverse employment action. *See id.* Certainly, an outright denial of a promotion would qualify. *See Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1333 (11th Cir.1998) (listing the elements for a prima facie case of discriminatory failure to promote). Here, though, plaintiff was offered a conditional promotion. The crucial consideration, therefore, is whether those conditions could be considered so onerous as to make the offer of promotion, which by itself is a favorable decision, an adverse employment action. The Court does not dispute that the plaintiff considered the conditions, including the proposed assignment to Calvary Hills, to be adverse, but the plaintiff's subjective dislike for the terms of the offered promotion is not relevant to the finding of adversity; the proper standard calls for a determination of whether the action was objectively adverse as viewed by a reasonable employee. *See Maniccia v. Brown,* 171 F.3d 1364, 1369–70 n. 3 (11th Cir.1999) (noting that a finding of an adverse employment action was not warranted when the only supporting evidence was the plaintiff's claim that she considered the transfer in question to be a demotion); *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1449 (11th Cir.1998) (concluding after

examining the concept of "adverse employment action" as applied generally in employment discrimination cases that a "plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse"); *Smith v. Alabama Dep't of Pub. Safety,* 64 F.Supp.2d 1215, 1221 (M.D.Ala. 1999) ("[T]he mere fact that an employee dislikes his or her employer's action is not sufficient to establish the element of adverse employment action required in employment discrimination cases."); *Perryman v. West,* 949 F.Supp. 815, 819 (M.D.Ala.1996) ("[A]n employment action must affect a term or condition of employment and is not adverse merely because the employee dislikes it or disagrees with it."). In the instant case, the Court cannot find that a reasonable employee would view the conditions and site assignment associated with the plaintiff's offer to be adverse under the circumstances.

■ Two conditions were placed upon the plaintiff: that he participate in a writing skills program, selected by him but funded by the defendant, and that Richard Liles evaluate the plaintiff at three months and at six months, in addition to the normal six month and one year reviews by the plaintiff's more immediate superiors. (*See* Liles Dep. 103–04; Puckett Dep. 107–08.) The writing program was envisioned as a short-term, one-on-one course of private tutoring designed to help the plaintiff improve his written communication skills, which skills are listed as a requirement for the programmer position (along with the ability to prepare reports from a variety of sources) and which skills plaintiff has admitted are used in the job, after Liles found the plaintiff's writing to lack detail. (*See* Liles Dep. 113–15, 121–23; Pennington Handwritten Notes (Doc. 000320); Pennington Dep. 90–91; Neighborhood Services Programmer Position Class Specification 2.) Many employers condition promotion on the completion of a course designed to improve necessary job skills, and no reasonable employee would view such a

requirement as objectively adverse. *Cf. Doe*, 145 F.3d at 1452–53 (finding that condition, imposed as a result of involuntary transfer, that teacher obtain ten hours of credit toward teaching certificate in specialization different from her previous area was not objectively adverse). The second condition of three and six month evaluations would not, as plaintiff apparently has argued, have imposed on plaintiff additional formal performance reviews; rather, the so-called "evaluations" were merely to allow a structure in which Liles could provide the plaintiff with feedback and suggest possible solutions or offer assistance as the plaintiff attempted to adjust to his new duties and through which Liles could ensure that the plaintiff would not suffer any retaliation for his prior religious accommodation. (*See* Liles Dep. 104–11.) Again, no reasonable employee could find these feedback sessions, designed to assist in the transition to the new position and to reduce the possibility of real retaliation, as objectively adverse.

■ Furthermore, the plaintiff's proposed assignment to the Calvary Hills Center rather than to his preferred location, the Scruggs Center, to which a white comparator (Joey Flanders) was assigned, did not make the offer an adverse employment action. The only arguments that the plaintiff has even remotely raised to suggest that the Calvary Hills assignment was adverse are that he had not previously worked at that center; that he had worked at the Scruggs Center; that he applied for the promotion in order to work at Scruggs; that the Calvary Hills center had more rowdy patrons; that had he not been assigned to Calvary Hills, which had some different programs than did Scruggs, the conditions placed on his promotion, supposedly, would not have been necessary; and that no reason prevented Flanders's assignment to Calvary Hills rather than to Scruggs. Although the plaintiff attacks

the wisdom of the defendant's business judgment regarding its employee assignments, which courts rightfully will not normally review,[11] he makes no showing that would support a finding of an objectively adverse action. No evidence suggests that a promotion to a position at the Calvary Hills Center would have entailed less pay or prestige or fewer benefits than an assignment elsewhere or that, because of the different programs or the presence of more rowdy patrons, the duties required of the programmer at Calvary Hills would have been more demeaning or even more demanding than at Scruggs. *Cf. Maniccia*, 171 F.3d at 1369–70 n. 3 (finding no support for an adverse employment action where no evidence was presented that the plaintiff's transfer to a different duty assignment would involve a reduction in pay or benefits); *Doe*, 145 F.3d at 1452 (citing cases and noting that transfers resulting in reduced pay or responsibility or prestige or that undercut the affected employee's professional development are adverse employment actions); *Evans v. McClain of Ga., Inc.*, 131 F.3d 957 (11th Cir.1997) (concluding that plaintiff had established prima facie case of failure to promote where "promotion" resulted in constantly changing job assignments and performance of "demeaning and menial tasks"); *McCabe v. Sharrett*, 12 F.3d 1558, 1564 (11th Cir.1994) (finding that transfer to lower ranking position involving less prestige and more menial work but without pay decrease was an adverse employment action). At best, the plaintiff has established that the two centers differed in certain respects but has failed to show that one center was better than the other, much less show that Calvary Hills was so undesirable as for an assignment there to constitute an adverse employment action.

■ In addition to not presenting any evidence of an adverse employment

---

**11.** In a slightly different context, the Eleventh Circuit has written that an employer's "decision ... may seem to some to be bad business judgment, and to others to be good business judgment, but federal courts do not sit to second-guess the business judgments of employers." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997).

action associated with the conditional offer of promotion, the plaintiff has failed to satisfy the fourth element of his prima facie case, which requires some showing that an otherwise similarly situated employee outside the plaintiff's class was treated dissimilarly. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff makes much of the fact that the conditions placed upon his promotion were not also placed on the promotion given Flanders. However, dissimilar treatment is not synonymous with discrimination. As the Eleventh Circuit recently acknowledged:

> Every employment decision involves discrimination. An employer, when deciding who to hire, who to promote, and who to fire, must discriminate among persons. Permissible bases for discrimination include education, experience, and references.... Thus, in an employment discrimination suit, the key question usually is: On what basis did the employer discriminate?

*Wright v. Southland Corp.*, 187 F.3d 1287, 1289 (11th Cir.1999). An employer who makes a distinction between employees because that employer believes the employees are not similarly situated does not discriminate on an impermissible basis. *See Jones v. Gerwens*, 874 F.2d 1534, 1540–41 (11th Cir.1989); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186–87 (11th Cir.1984) (finding that the plaintiff had failed to demonstrate a prima facie case where he had failed to show that his purported comparator was actually similarly situated). The conditions imposed upon the offer made to the plaintiff were not imposed on the offer made to Flanders because the decision-maker, Richard Liles, did not believe they were necessary with Flanders. (*See* Liles Dep. 104.) Although Liles had concerns over the plaintiff's writing ability and over

his ability to become involved in the community based programs administered through the recreation center, the same concerns were not present with Flanders, who was considered to have good communication skills and who had put forth new ideas for the Scruggs Center. (*See* Liles Dep. 79–81, 1005–06, 113–15, 121–22.) The plaintiff was treated in a different manner from Flanders because they were not viewed as similarly situated.

 Even granting that the plaintiff established an at-best-weak prima facie case of race-based disparate treatment, the defendants have articulated legitimate, nondiscriminatory reasons for placing conditions on the plaintiff's promotion and for assigning him to the Calvary Hills Center rather than to the Scruggs Center, but the plaintiff has failed to offer any significant evidence from which a rational trier of fact could choose to disbelieve all of the defendant's explanations as mere pretext. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528–29 (11th Cir.1997) (analyzing the burdens of proof and production in a Title VII disparate impact case based upon circumstantial evidence). As just discussed, the conditions attached to the plaintiff's offer were based upon the decision-maker's stated concerns over the plaintiff's skill in writing and over the plaintiff's ability to go beyond his previous role and become involved in the community based programs offered through the recreation center. The site assignment was based on the decision-maker's overall evaluation of the fit between the two centers and the respective skills of the plaintiff and his comparator, and in particular, the comparator's better communication skills and his ideas for the Scruggs Center. (*See* Liles Dep. 79–80.) Although the plaintiff has advanced a number of arguments in an attempt to demonstrate some basis from which an inference of pretext could be drawn,[12] the plaintiff's attack is

---

**12.** The plaintiff has attacked the subjectiveness of Richard Liles's evaluation of the writing samples and the criteria used to match programmers to recreation centers, but the use of subjective components in making personnel decisions is not per se impermissible,

essentially on the wisdom, rather than any improper, race-based motivation, underlying the defendant's actions. Title VII, though, does not mandate that employers make smart or even fair choices in their personnel decisions. "The employer may [make a decision regarding] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *See Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984). Only where the merits of the employer's choice and the proffered reasons are so utterly dubious that no remotely reasonable employer would make the same selection in the absence of illegal considerations, will courts begin to question the defendant's poor business judgment. *See Combs,* 106 F.3d at 1543. *Cf. Deines v. Texas Dep't of Protective and Regulatory Servs.,* 164 F.3d 277, 281–282 (5th Cir.1999) (approving jury instructions that the jury's place is not "simply to second guess the defendant's hiring decision as to which candidate was best qualified or best suited for the job" and that "disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless they are so apparent as virtually to jump off the page and slap you in the face" because "[t]here is then, for the purposes of proving pretext, a difference in simply 'second-guessing' an employer's judgment and finding proof of mendacity"). Although the plaintiff may have been the better candidate for the position at the Scruggs Center and although Liles may have been mistaken in his low opinion of the plaintiff's writing ability and in his concerns over plaintiff's ability to move beyond his former job without additional guidance, viewing all of the evidence in the light most favorable to the plaintiff, the Court cannot conclude that the he has produced evidence sufficient enough to allow a reasonable finder of fact to conclude that discrimination was the defendant's true motive or that the defendant's judgments regarding the need to condition the offer of promotion made to the plaintiff or to assign the plaintiff to a center other than his first choice were so clearly irra-

and plaintiff has failed to make any significant showing that the decision-maker used race or another prohibited factor in making his evaluations of the candidates for the positions. *See McCarthney v. Griffin–Spalding County Bd. of Educ.,* 791 F.2d 1549, 1552 (11th Cir.1986). Indeed, subjective factors, such as ability to work with others or to take direction or to communicate effectively, often combine with more objective criteria to play an important overall role in an employer's decision. Although the courts of this circuit have required greater specificity when subjective factor are used in taking an employment action, they do not typically question purported legitimate business judgments except when the employee has met his prima facie case and the employer attempts to rely solely on highly subjective reasons that are not capable of independent support or are not capable of objective evaluation and upon which the employee has cast substantial doubt as to their truth. Only then is the finder of fact permitted to evaluate the legitimacy of the employer's use of the subjective factors at issue. *See Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 643–45 (11th Cir.1998); *Hill v. Seaboard Coast Line R.R. Co.,* 885 F.2d 804, 808–09 (11th Cir.1989); *Miles v. M.N.C.*

*Corp.,* 750 F.2d 867, 871–72 (11th Cir.1985); *Fowler v. Blue Bell, Inc.,* 737 F.2d 1007, 1011–12 (11th Cir.1984). The plaintiff also takes issue with the fact that the decision-maker used multiple criteria and had some difficulty in recalling specific details concerning his reliance on several proffered, permissible factors. That the decision-maker had difficulty four years later remembering certain details concerning specific promotion and placement considerations is irrelevant because the criteria that Liles did remember in detail have not been rebutted by the plaintiff. *See Combs,* 106 F.3d at 1543 (noting that to avoid summary judgment, a plaintiff must "produc[e] evidence sufficient to discredit in the mind of a reasonable juror *all* of the defendant's proffered nondiscriminatory reasons for its actions") (emphasis added). Furthermore, the criteria that could not be recalled in detail were all legitimate reasons that would justify the defendant's actions and, therefore, cannot be a basis for finding pretext. *See Tidwell Prods. v. Carter,* 135 F.3d 1422, 1428 (11th Cir.1998) (noting that "the existence of a possible, additional non-discriminatory basis for [the employer's actions] does not, however, prove pretext").

tional that the only sensible explanation for them would be discrimination.

## 2. The Retaliation Claim

Plaintiff, apparently, attempts to assert a separate Title VII claim of retaliation for prior complaints regarding religious accommodation, which claim also allegedly arises from the defendant's conditional offer of promotion to the neighborhood services programmer position.[13] "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994)). The first element is not in dispute. However, as discussed in the previous section, plaintiff has not demonstrated that any objectively adverse employment action was taken and, therefore, has failed to meet the second element of his prima facie case.

 In addition, were plaintiff subjected to an adverse employment action, he still has not satisfied the remaining element of a causal link. First, the defendant or its relevant agent must be aware of the protected activity at the time of the decision. *See Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197–98 (11th Cir.1997). *See also Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir.1999) (listing the employer's awareness as a separate element of the prima facie case). Here, Richard Liles, the decision-maker, was aware of plaintiff's past complaints and had been involved in the process of trying to accommodate plaintiff's religious beliefs in 1994. However, the timing of those complaints relative to Liles's 1996 decisions to condition the plaintiff's promotion and to assign plaintiff to the Cal-

vary Hills Center does not support the existence of the required causal nexus between the employee's activity and the employer's action. "Far from demonstrating a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to [plaintiff's] protected activity." *Maniccia*, 171 F.3d at 1370. Simply put, the two years that elapsed between the plaintiff's complaints and Liles's decisions represent too long a period without reprisal to suggest a causal link. *See id.* at 1369–70 (finding that gaps of 15 and 21 months between the employee's and the employer's respective actions were too great to support a causal nexus and citing additional cases finding a lack of causal link following even shorter intervals). *See also Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1395 (10th Cir.1997) (finding that a gap of a mere four months between the protected activity and the employer's action did not show a causal link); *McClure v. Cywinski*, 686 F.2d 541, 546 (7th Cir.1982) (finding that three and a half month lapse between comments and employment action undercut causation element). *Cf. Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, (11th Cir. 1999) (finding causal link demonstrated where employee was discharged seven weeks after engaging in protected conduct); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir.1998) (finding causal link supported where "adverse employment actions commenced almost immediately after management learned" that employee had participated in protected activity); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (finding that interval of one month between protected activity and employer's action supported causation).

Furthermore, even assuming a prima facie case of retaliation under Title VII, the defendant has offered several legiti-

---

13. At various times, the plaintiff has suggested additional protected activities as bases for retaliation but has not argued or even devel-

oped the evidence of those other, possible grounds.

mate, nondiscriminatory reasons for its decisions, which reasons have not been rebutted by the plaintiff. The defendant's explanations for its decisions have been discussed at great length in the immediately preceding section and need not be repeated here. Again, plaintiff more or less has questioned the soundness of the conditions placed on his promotion and the planned assignment to the Calvary Hills Center but has failed to offer any significant evidence of pretext (not already discussed in the previous section) from which a rational trier of fact could find an improper motivation on the part of the defendant. *Cf. Combs v. Plantation Patterns,* 106 F.3d 1519, 1543 (11th Cir.1997). In a case such as this, "[w]here the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer." *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987). Accordingly, the Court finds that defendant is entitled to summary judgment as to both the discrimination claim and the retaliation claim premised on the events surrounding the conditional offer of promotion extended to plaintiff.

## B. The Initial Failure to Promote

Now the Court turns to the remainder of the plaintiff's case. Apart from the claims already analyzed, plaintiff has brought two additional Title VII claims based upon the defendant's initial decision not to offer plaintiff a promotion to the position of neighborhood services programmer in June of 1996. He alleges both retaliation for his previous grievances concerning religious accommodation and disparate treatment because of race. The Court will consider the retaliation theory first.

### 1. The Retaliation Claim

█ Initially, plaintiff must establish a prima facie case of retaliation; here, plaintiff has failed to do so. Generally, to establish a prima facie case of retaliation, a Title VII plaintiff must present some evidence tending to show each of the following: (1) that the plaintiff engaged in a protected activity; (2) that subsequent to that participation, the plaintiff suffered an adverse employment action; and (3) that a causal nexus existed between the protected activity and the adverse employment action. *See Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1196 (11th Cir.1997). The first element is not in dispute. However, the Court finds that plaintiff has failed to satisfy either the second or the third element.

Determining whether the plaintiff actually suffered an adverse employment action presents the more difficult question. Although the defendant's initial decision was not to offer plaintiff a promotion, that decision was swiftly reversed following the plaintiff's complaints to the defendant's Equal Employment Officer, Mia Puckett, and he was soon offered a promotion to the position originally sought. The Court's natural inclination is to find no adverse employment action as the plaintiff was quickly offered the desired promotion. The Court recognizes, though, that it must be guided not by its intuition but by the Eleventh Circuit's recent decision in *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453 (11th Cir.1998). In *Wideman,* the court of appeals held "that Title VII's protection against retaliatory discrimination extends to adverse actions which fall short of ultimate employment decisions." *See Wideman,* 141 F.3d at 1456. But, the court also acknowledged "that there is some threshold level of substantiality that must be met for unlawful discrimination to be cognizable under the anti-retaliation clause," yet it failed to announce or offer any standards by which to gauge that minimum "level of substantiality." *See id.*

In analyzing whether plaintiff actually suffered an adverse employment action despite the fact that the initial decision not to offer him a promotion was quickly re-

versed, this Court considers not only *Wideman* and similar cases contemplating the concept of adverse employment action but also the purpose and spirit of employer-maintained Equal Employment Opportunity programs, such as the one to which plaintiff complained upon learning of the defendant's short-lived first decision. Starting with the case law, the Court finds no support for an adverse employment action. The facts of *Wideman* itself are egregious; the plaintiff was given undeserved reprimands, she was required to work without lunch and to work on days on which she was not scheduled, fellow employees were canvassed for negative comments about the plaintiff, the defendant improperly delayed in authorizing needed emergency medical treatment for the plaintiff, and an assistant manager threatened to shoot plaintiff. *See id.* at 1455. Clearly, the facts of the instant case do not even suggest the level of adversity suffered by the plaintiff in *Wideman.* Much more analogous to the present matter is *Blalock v. Dale County Bd. of Educ.,* 84 F.Supp.2d 1291 (M.D.Ala.1999). In *Blalock,* as in the instant case, the defendant employer swiftly rescinded an earlier decision (an allegedly disadvantageous transfer) and the court found no adverse employment action. *See Blalock,* 84 F.Supp.2d at 1309–11 (discussing *Wideman* and *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274 (11th Cir.1999)).

 Most analogous is *Shabat v. Blue Cross Blue Shield,* 925 F.Supp. 977 (W.D.N.Y.1996), *aff'd sub nom., Shabat v. Billoti,* 108 F.3d 1370, 1997 WL 138836 (2d Cir.1997). In *Shabat,* the plaintiff claimed that disparate treatment because of national origin and religion had resulted in a failure to promote, but the court found no adverse action because the plaintiff had, in fact, received a promotion. *See Shabat,* 925 F.Supp. at 987. The plaintiff's real complaint was that he had not been offered a promotion sooner and that the promotion came about only because the plaintiff had confronted his superior, charging that

plaintiff had heard that the supervisor had decided never to promote him. *See id.* The delay in the eventual promotion, which advancement may have been precipitated by the plaintiff's challenge to his supervisor, did not constitute an adverse employment action. *See id.* Given that the plaintiff here, like the employee in *Shabat,* was swiftly offered a promotion after voicing his concerns and given that the plaintiff suffered no real consequences from the initial contrary decision, *Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1284 (11th Cir.1999) (adopting the district court's opinion finding of no adverse employment action where "plaintiff did not suffer any repercussions"), the Court finds that, at worst, Pennington suffered a delay in his promotion, which did not rise to the level of substantiality required for an adverse employment action.

The Court's finding of no adverse employment action is further bolstered by a consideration of the purpose behind independent, employer-maintained Equal Opportunity Offices, such as the program run by the defendant. The obvious idea is to provide an early forum to which employees may turn with their concerns so that potentially impermissible practices may be addressed before any injury occurs. That system worked precisely as designed in the case at bar: plaintiff voiced his concerns over the defendant's initial decision, that decision was quickly reversed, and the plaintiff was offered the position he had sought. In short, the goal of equal employment was served in the plaintiff's case. A finding of an adverse employment action would violate the spirit of Title VII and would vitiate an important component of the intended enforcement system. *See, e.g., McCarthney v. Griffin–Spalding County Bd. of Educ.,* 791 F.2d 1549, 1553 (11th Cir.1986) ("Nothing in Title VII prevents an employer from attempting to solve disputes amicably. Indeed Title VII prefers informal settlement of disputes.").

Additionally, plaintiff has failed to show a causal link between his protected activity

and the defendant's actions. As discussed in the previous section, the amount of time that elapsed between the plaintiff's complaints concerning his requested religious accommodation in 1994 and the defendant's decisions regarding the neighborhood services programmer position in 1996 is simply too great to support a causal nexus between the two events. *See Maniccia v. Brown*, 171 F.3d 1364, 1369–70 (11th Cir.1999). The only other evidence which plaintiff has presented that could fairly be said to show some causal link between the plaintiff's protected activities and the defendant's initial decision is the explanation that Tony Hughes supposedly gave to Mia Puckett about the factors considered. However, the Court has already concluded that Puckett's interpretation of Hughes's statements was in error. Hughes did not look at the plaintiff's grievances regarding religious accommodation, but rather considered his poor reaction to a transfer, which was only coincidentally connected to the religious accommodation provided plaintiff. In summary, the plaintiff has not offered any significant evidence of a causal link or an adverse employment action and, therefore, he has not made his prima facie case; this failure entitles the defendant City of Huntsville to summary judgment as to the plaintiff's retaliation claim arising from the initial but swiftly rescinded decision not to offer plaintiff a promotion to the position of neighborhood services programmer.[14]

**2. The Race Claim**

Little need be said about plaintiff's remaining claim. In general, a prima facie case of disparate treatment in failing to promote requires the plaintiff to show the following elements: (1) that the plaintiff belonged to a protected class; (2) that the plaintiff was qualified for the desired promotion; (3) that the plaintiff was rejected; and (4) that the position was filled with a person outside the relevant protected class. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1333 (11th Cir.1998) (citing *Coutu v. Martin County Bd. of County Comm'rs*, 47 F.3d 1068, 1073 (11th Cir.1995)). Here, the plaintiff cannot meet the third prong of his prima facie case because he was, in fact, offered a promotion to the position sought. Even if the Court were, as it did in Section 1 of Subpart A of Part IV of this opinion, to reformulate the specific prima facie requirements under *McDonnell Douglas* to better reflect the particular circumstances of this case, the plaintiff still would not be allowed to proceed. *McDonnell Douglas* requires a showing that some adverse employment action was taken against the plaintiff and that otherwise similarly situated employees of a different race were treated dissimilarly. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, as just discussed in the preceding section, plaintiff has not shown that he suffered any adverse employment action as a result of the defendant's initial decision. Furthermore, the plaintiff has failed to demonstrate that he was truly similarly situated to his purported comparator. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1186–87 (11th Cir.1984) (finding that the plaintiff had not met his prima facie case because he had not demonstrated that the he was similarly situated to any differently treated employees). Finally, plaintiff has offered absolutely no

---

**14.** Although not required to decide this case, the Court notes that the defendants did have legitimate, nondiscriminatory reasons for initially selecting plaintiff's comparator, Joey Flanders, for promotion. According to the de facto decision-maker, Tony Hughes, the initial decision was based on his limited personal knowledge of the candidates, their responses to interview questions, and the contents of their personnel files. (*See* Hughes Dep. 45–46.) Hughes was particularly impressed with Flanders because he had received highly favorable evaluations from two different supervisors. (*See* Hughes Dep. 46.) In contrast, the plaintiff's personnel file contained two reprimands, one for taking leave without approval and one for tardiness to and sleeping during a mandatory training session. (*See* Docs. 0000162–63.)

other evidence even remotely suggesting a racially biased motive in the defendant's initial decision. Succinctly put, the plaintiff has utterly failed to demonstrate any support for his race claim premised upon the defendant's abruptly reversed first decision, and defendant is due summary judgment.

## V. Conclusion

In conclusion, the Court holds that no material issues of fact remain and that defendant City of Huntsville is entitled to judgment as a matter of law as to all of the plaintiff's claims. A separate order consistent with the findings detailed in the memorandum of opinion will be entered.